Ernest C. **HORTON,** Mary Horton, James Daniel Horton and Anthony Wayne Horton, Movants,

v.

The **UNION LIGHT, HEAT & POWER COMPANY,** Respondent.

Supreme Court of Kentucky.

April 11, 1985.

Rehearing Denied June 14, 1985.

John S. Palmore, Henderson, Robert W. Carran, Philip Taliaferro, Covington, for movants.

Arnold Taylor, Gary J. Sergent, O'Hara, Ruberg & Taylor, Edgewood, for respondent.

LEIBSON, Justice.

In the early morning hours of December 10, 1977, the home of the movants, Ernest and Mary Horton, in Florence, Kentucky, was destroyed by an explosion of natural gas which had leaked into their house from a break that had occurred in the line outside their house at a point near the intersection of their driveway and the street. The respondent, The Union Light, Heat & Power Co., was the local gas company charged with responsibility for maintenance and repair of the line.

Mr. and Mrs. Horton and two of their children, James and Anthony, were in the house at the time of the explosion. The Hortons sued the gas company for both personal injuries and property damage, alleging negligence and gross negligence on the part of the respondent and its employees, seeking both compensatory and punitive damages. The jury found for the movants on all counts, rendering separate awards for compensatory damages and punitive damages to each of them, aggregating $109,254 in compensatory damages and $520,000 in punitive damages.

The gas company paid the various awards for compensatory damages and appealed the awards for punitive damages. The Court of Appeals held the evidence was insufficient to justify an award of punitive damages, and reversed.[1] We accepted discretionary review to consider whether the Court of Appeals erred in deciding the evidence was insufficient to justify submitting to the jury the issue of gross negligence and punitive damages, and, if so, to consider two further questions, one raised by the gas company in the court below and one inherent in the proceedings; viz., (1) whether the gas company should be responsible for punitive damages resulting from gross negligence of its employees while acting in the scope of their employment, and (2) whether the concept of punitive damages is an outmoded aspect of the

1. Presumably the effect of the Court of Appeals's decision is to reverse and dismiss the award for punitive damages, although the opinion does not so state.

common law which should now be discarded.[2]

We reverse the Court of Appeals and affirm the verdict and judgment in the trial court awarding punitive damages.

In *Fields v. Western Ky. Gas Co.*, Ky., 478 S.W.2d 20 (1972), the plaintiff was injured in a natural gas explosion and the trial judge directed a verdict on grounds the evidence as he viewed it was insufficient to submit the issue of liability to the jury. We stated:

"We are unable to agree with the trial court concerning his reason for decision. Upon consideration of a motion for directed verdict, the plaintiff is entitled to the most favorable inferences and construction attributable to the evidence. If such evidence is so regarded and substantially tends to support the cause of action, the verdict should not be directed against him." 478 S.W.2d at 22.

The judicial decision regarding when to save the interpretative function for the court and when to delegate the interpretative function to the jury is crucial to the development of negligence law. The more judges take cases away from juries, the more the concepts of reasonable conduct, negligence and gross negligence become synonymous with the view of the judge or judges on that court. Likewise, the more the interpretative power is delegated to juries, the more these concepts become the aggregate of discrete findings by juries. See L. Green, *Judge and Jury* (1930). By delegating interpretation to a jury the judiciary allows current considerations of equity and common sense to modify what might otherwise become anachronistic principles. L. Green, *supra*, at 385–91. The role of the jury in interpreting the evidence and finding the ultimate facts is an American tradition so fundamental as to merit constitutional recognition. U.S. Const.Amend. VII; Ky. Const. Sec. 7. The conscience of the community speaks through the verdict of the jury, not the judge's view of the

evidence. It may well be that deciding when to take a case away from the jury is a matter of degree, a line drawn in sand, but this is all the more reason why the judiciary should be careful not to overstep the line.

The role of the appellate court when deciding negligence issues of this sort is limited to viewing the evidence from a standpoint most favorable to the prevailing party. *Lever Bros. Co. v. Stapleton,* 313 Ky. 837, 233 S.W.2d 1002 (1950). In negligence cases such as this one the verdict of the jury resolves any conflicts in the testimony and also any conflicts in the reasonable inferences to be drawn from the testimony in favor of the prevailing party, in this case the Hortons. *Current v. Columbia Gas of Ky., Inc.,* Ky., 383 S.W.2d 139 (1964); *Mahan v. Able,* Ky., 251 S.W.2d 994 (1952); *Murphy v. Homans,* 286 Ky. 191, 150 S.W.2d 14 (1940). In short, an appellate court must not substitute its findings of fact for those of the jury if there is evidence to support them.

The language in the Court of Appeals' opinion suggests that the Court of Appeals may have made findings of its own, rather than limiting to its appropriate role in reviewing the sufficiency of the evidence. The Court's opinion states:

"Here, although the evidence clearly indicated that [the gas company] employees used very poor judgment in dealing with the situation at [the Horton] home, *we cannot say* that their conduct amounted to a level of wanton and reckless indifference." (Emphasis added)

What then is the evidence when we respect the rule that the prevailing party "is entitled to the most favorable inferences and construction attributable to the evidence"? *Fields v. Western Ky. Gas Co., supra.*

Mary Horton was awakened by a strong smell of gas in her bedroom. She aroused her husband who checked their gas appli-

**2.** In brief and at oral argument the appellee conceded that punitive damages were an appropriate remedy in a civil action for an intentional tort or where authorized by statute, confining the issue to whether punitive damages should be abolished in gross negligence cases.

ances, finding no difficulty, and she then notified the gas company by telephone of the odor of gas in the house from a suspected leak.

A customer service representative from the gas company with responsibility to detect and correct problems from gas leaks inside the house, responded to the call. After parking his truck he noticed a strong odor of gas and heard a hissing sound emanating from the ground in the area where the Horton driveway intersected the street. He was not equipped to do outside work.

This customer service representative proceeded into the house, made what was obviously a superficial check of the inside situation during which he concluded that there was some gas odor in the main floor area but not in the basement where the furnace and hot water heater were located, and erroneously concluded that gas escaping from a break out by the street was possibly entering the house downward through the chimney (although natural gas is lighter than air), ignoring the likelihood that gas from the place where the break occurred would follow the passageway which accommodated the line into the house, providing a continuing source and a growing concentration of gas in the house.

The gas company's customer service representative suggested that Mrs. Horton close the damper to exclude the possibility (highly unlikely) that gas from outside the house would enter down the chimney, and said it would be alright to leave running the kitchen exhaust fan. This fan vented into the attic area which he had not inspected.

This employee was equipped with and had been trained in the use of a combustible gas indicator, sometimes called an "explosive meter." This was a device to measure the amount of gas and to detect its point of entry into an enclosed area. He left it in his car, depending instead on his nose, which proved inadequate to the test. Having erroneously concluded that there was no gas leaking inside the house, he told the Hortons that the house was safe

and telephoned the gas company to send a construction and maintenance crew to repair the break in the line down by the driveway. He never again entered the house to check for the presence or concentration of gas, nor did any of the other gas company workmen who later arrived on the scene.

The field supervisor of the construction and maintenance crew who came in response to his call to repair the break testified that *had the customer service representative told him of the smell of gas* in the house, that he, the supervisor, would have checked all of the rooms in the house, including the attic, with an explosive meter, and would have continued to monitor the house for further accumulation of gas.

The customer service representative testified, and company records confirmed, that contrary to the testimony of the field supervisor, the customer service representative did tell him of at least a "slight odor" of gas inside the house, which should have triggered these further precautionary measures which the field supervisor disregarded.

This supervisor had authority to cut off the gas supply in the event of an emergency, and could have done so before the explosion. He could have directed the occupants to evacuate. Instead he and his crew set about locating and repairing the leak in the area near the driveway, neither cutting off the gas supply nor making any effort to evacuate the occupants of the house.

At 4:35 AM, two hours after Mrs. Horton's initial complaint, more than one hour after the customer service representative had arrived on the scene, and some twenty minutes after the arrival of the field service supervisor and his crew, the house exploded. The most likely explanation was gas from the break near the street entering the house through the tunneling provided to accommodate the gas lines, concentrating in the attic since it was lighter than air and assisted to that location by the exhaust fan, and ignited by warm coals left over from a fire in the fireplace in the family room where the damper had been closed at

the direction of the gas company's customer service representative.

Perhaps the most damaging evidence when the finding of gross negligence and the award of punitive damages is considered was the testimony of Ernest Murphy, who served as Chief Utility Inspector with the Kentucky Public Service Commission during the period in question, and who had a history of twenty year's experience with the state government administering programs and rules to provide for safety in the use and handling of gas by utility companies.

During the four months preceding the night of the explosion Mr. Murphy had repeatedly attempted to get the respondent gas company to revise its existing emergency plan, the plan by which the company is supposed to provide its employees with directions for handling trouble situations of the kind presently involved. The gas company employees on the scene at the time and before the explosion had not seen any emergency plan and, specifically, had not been instructed to use the explosive meter under the circumstances apparent to them.

Mr. Murphy had provided the gas company with a model plan which he had developed to meet Federal Safety Standards, and which, if used, would have prevented the explosion that occurred. This plan included a specific requirement that a gas indicator, or explosive meter, be used "immediately after entering [the] house" in the rooms and spaces in and under a house whenever a gas leak is suspected or detected. It specifies:

> "Do not rely on your sense of smell to determine if gas is present in a building or in the ground. *Use instruments provided you for this use.*" (Emphasis original.)

Appropriate training sessions were to be held with respect to emergency procedures. This and other similar safety precautions were not contained in the gas company's own plan. Although a customer service representative such as the one involved in this case was furnished an explosive meter and trained in its use, he was perfectly free to use his own judgment as to whether to use it, and, if he chose, as did the company's employee in this case, rely on his nose (a poor substitute) as to the existence, concentration and source of escaping gas.

There was substantial evidence that the company not only ignored Mr. Murphy's suggestions, but resented his efforts to upgrade its safety procedures, which were referred to as "nit-picking," and, indeed, misrepresented to the Public Safety Commission the training it provided to employees in safety procedures. Two months before the explosion the manager of the company's Gas Engineering Department wrote to the Public Service Commission stating that the company was taking certain actions to upgrade its own plan and to evaluate it in the field, when such was not the fact.

From all of this the jury could conclude that the negligence of the employees at the scene, which finding was not appealed, was something more than ordinary negligence; that the employees were aware that gas had escaped into the Horton house, was probably still there and still leaking into the house, but failed to make any effort to determine its concentration or source both initially and by further monitoring. These employees also failed to cut off the gas supply to the residence or suggest that the residents evacuate, which the jury may have considered gross negligence considering the combustible and explosive nature of gas and the circumstances at the time.

Moreover, while no one suggests that the gas company or its employees intentionally injured the Hortons, these actions of the employees at the scene must be considered together with the policy and procedures of the gas company in training its employees to handle such emergencies, as evidenced by the testimony of Mr. Murphy of the Public Service Commission and the company's correspondence with the Commission. Viewed cumulatively the evidence was sufficient for the jury to conclude that the totality of circumstances indicated "a wanton or reckless disregard for

the lives, safety or property of other persons." This was the standard for deciding "gross negligence" submitted by the instructions. These instructions have not been challenged in this case.

■ Although it is reasonably arguable that the negligent acts and omissions of the gas company's employees at the scene, standing alone, are sufficient to justify a finding of gross negligence and an award of punitive damages, the further evidence regarding the policies and procedures of the company must also be considered. We adopt with approval the view of the Supreme Court of Wyoming, expressed in *Brown v. Riner*, Wyo., 500 P.2d 524, 528 (1972):

"Even where a single act of negligence might not constitute gross negligence, gross negligence may result from the several acts."

As expressed at the outset of this opinion there are two further issues of fundamental importance to be addressed after we decide that under present law the evidence justified a finding of gross negligence as defined in the instructions. One is whether the concept of punitive damages is an outmoded concept which should be discarded, and the second is whether and when a corporation should be adjudged liable for punitive damages based on the gross negligence of its employees.

Respondent contends that "[p]unitive damages have outlived their usefulness and should be removed as a separate item of damages from the common law." Respondent cites cases from four states as having "already so held." One of these cases is from Nebraska, decided in 1975. But the other three decisions are from Louisiana in 1917, Massachusetts in 1914, and Washington in 1891. Considering the dates, it is difficult to view these cases as expressing a modern trend.

The concept of permitting punitive damages in addition to compensatory damages is one of longstanding in Kentucky. Counsel for movants has argued that it is a right protected from change by this court by the spirit if not the literal language of Section 54 of the Kentucky Constitution.[3] Older cases, a number of which predate our Constitution, recognize and approve the award of punitive damages in addition to compensatory damages, against corporations and other employers based on gross negligence of their employees. See *Louisville & N.R. Co. v. Kelly's Adm'x*, 100 Ky. 421, 38 S.W. 852 (1897) and *Maysville & Lexington R.R. Co. v. Herrick*, 76 Ky. (13 Bush) 122 (1877).

In *Chiles v. Drake*, 59 Ky. (2 Metc.) 146, 74 Am.Dec. 406 (1859), our court provided a rationale for the award of punitive damages, as viable now as it was then:

"They are allowed because the injury has been increased by the manner it was inflicted." 59 Ky. at 151.

The difficulty comes not from the concept of punitive damages but in defining the type of conduct which should justify such an award.

Analyzing precedent to define the type of conduct that should justify punitive damages is difficult because the concept cuts across a panoply of torts diversified in nature. In the beginning "torts" was an amorphous umbrella covering a number of different causes of action, diverse in character, historically developing from a number of different ancient English writs allowing compensation for wrongs not arising out of contract. The concept of torts as an entity, a branch of the law separate and distinct, as opposed to unrelated writs, perhaps has its genesis in Blackstone's catchall reference to "torts" as "all actions for trespasses, nuisances, assaults, defammatory words, and the like." 3 W. Blackstone, *Commentaries on the Laws of England*, 117 (1771 Ed.).

Punitive damages were allowed just like compensatory damages for all of this wide variety of civil wrongs when there were

---

**3.** "The *General Assembly* shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property." Ky. Const. Sec. 54. (Emphasis added.)

sufficient aggravating circumstances, the distinction being not the intentional nature of the injury but whether there were sufficient "circumstances of aggravation or outrage." W. Prosser, *Law of Torts* § 2 at 9 (4th Ed.1971).

Although referring us to occasional judicial complaint against the concept of punitive damages in general, the respondent has limited the present attack to those torts involving negligent injury as opposed to intentional injury, presumably conceding that aggravating circumstances so enhance intentional injury that punitive damages are justified.

 But punitive damages are not justified just because the injury was intentional. For instance, in assault the mechanism for injury is intentional, but punitive damages are not justified if there is sufficient provocation. *Johnson v. Tucker,* Ky., 383 S.W.2d 325 (1964). In false arrest punitive damages are not justified absent "a showing that the acts were either willful or malicious or that they were performed in such a way as would indicate a gross neglect or disregard for the rights of the person wronged." *Ashland Dry Goods Co. v. Wages,* 302 Ky. 577, 195 S.W.2d 312, 315 (1946).

The *Restatement (Second) of Torts* § 908(2) (1979), states as the rule:

"Punitive damages may be *awarded for conduct that is outrageous,* because of the defendant's evil motive *or* his reckless indifference to the rights of others." (Emphasis added.)

 Thus "evil motive" and "reckless indifference to the rights of others" are considered as synonomous. The distinguishing characteristic in cases where punitive damages are authorized has not been whether the injury was intentional but whether the misconduct "has the character of outrage." *Hensley v. Paul Miller Ford Co., Inc.,* Ky., 508 S.W.2d 759, 762 (1974). The threshold for the award of punitive damages in a tort case is whether there is misconduct as described in the *Restatement, supra,* "outrageous" in character,

not whether the injury was intentionally or negligently inflicted.

The instructions in an intentional tort case define this characteristic as misconduct of a character that is "willful, malicious, and without justification," with the understanding that "[m]alice may be implied from outrageous conduct, and need not be express so long as the conduct is sufficient to evidence conscious wrongdoing." *Fowler v. Mantooth,* Ky., 683 S.W.2d 250 (1984). The instructions in a gross negligence case properly define this characteristic as was done by the trial court in this case, misconduct of a character evidencing "a wanton or reckless disregard for the lives, safety or property of other persons."

 In a case where gross negligence is used as the basis for punitive damages, terms such as willful and malicious occasionally have been used. But this terminology is a contradiction in terms when applied to negligent conduct, if we take it to mean intentionally causing injury to the victim. By definition a negligent injury has not been intentionally inflicted. But negligence when gross has the same character of outrage justifying punitive damages as does willful and malicious misconduct in torts where the injury is intentionally inflicted. Just as malice need not be expressed and may be implied from outrageous conduct, so too may wanton or reckless disregard for the lives and safety of others be implied from the nature of the misconduct. It would be difficult to fashion a better, simpler explanation for the characteristic of outrageous conduct attaching to an otherwise unintentional injury so as to justify punitive damages than the instructions used in this case. Conduct so outrageous as to merit this description is not qualitatively different from the conduct meriting punitive damages causing intentional injury. In order to justify punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by "wanton or reckless disregard for the lives, safety or

property of others." This bears an element not distinguishable from malice implied from the facts.

There is a reason for paying the punitive damages awarded to the injured party. It is because "the *injury* has been *increased* by the *manner* [in which] it was inflicted." *Chiles v. Drake, supra.* (Emphasis added) In *Louisville & N.R. Co. v. Roth,* 130 Ky. 759, 114 S.W. 264, 266 (1908), we explained that although "punitive damages are awarded as a civil punishment upon the wrongdoer, rather than as indemnity to the injured party ... it might with much propriety be said that they are allowed by way of remuneration for the aggravated wrong done." Thus there are sound legal reasons of longstanding supporting *both* the award of punitive damages *and* their payment to the injured party in addition to compensatory damages.

■ The concept of punitive damages represents more than mere blind adherence to ancient precedent. It is as just a principle and as fair to the litigants today as it ever was. Improperly applied, it may indeed be nothing more than a windfall or a double recovery. But there are few if any principles of law which could not be criticized as sometimes misapplied.

"It would be simplistic to characterize this virtual unanimity [among the states in adhering to the concept of punitive damages] as mere blind adherence to an outmoded principle. Rather, the doctrine of punitive damages survives because it continues to serve the useful purposes of expressing society's disapproval of intolerable conduct and deterring such conduct where no other remedy would suffice." Mallor and Roberts, *Punitive Damages Toward a Principled Approach,* 31 Hastings L.J. 639, 641 (1980).

■ Historically Kentucky has awarded punitive damages against the principal coextensive with the award of punitive damages against the agent, applying the agency principle, *respondeat superior,* in the same way to liability for punitive damages as it is applied when awarding compensatory damages. Respondent, the gas

company, argues that the punitive damages concept is abused when a corporation as principal is punished for the acts of its employees. This is *not* a case to begin considering whether to limit the application of punitive damages against a principal. Here the acts of managerial employees in establishing policy and procedures and in failing to do so, in training their personnel to handle situations such as the present one, and in their interaction with the Public Service Commission as indicated by their dealings with Mr. Murphy and their correspondence with the Commission, implicated the company as a whole in the charge of wanton or reckless disregard for the safety of others. Here liability for punitive damages is not based on a single, isolated unauthorized and unexpected act of negligence by an employee. The situation is not subject to the charge that the respondent is being punished when completely innocent and liable only vicariously.

The decision of the Court of Appeals is reversed. The judgment of the trial court is affirmed.

STEPHENS, C.J., and AKER, GANT, LEIBSON and WINTERSHEIMER, JJ., concur.

STEPHENSON and VANCE, JJ., files a separate dissenting opinion.

STEPHENSON, Justice, dissenting.

I am just not sure what the majority is driving at when it discusses when to delegate the interpretative function to the jury. I was not aware the jury had any interpretative function at all. Juries find facts from the evidence. It has always been the rule that the trial judge determines the law of the case from the evidence and instructs the jury accordingly. It has always been the function of the trial court to determine from the evidence if a case should go to the jury and the function of an appellate court to determine from the evidence whether the trial court has erred. I gather from the majority opinion we are being admonished not to interfere with current considerations of equity and common

sense on the part of a jury. I reject this philosophy absolutely. To adopt the theory of the majority would result in abdication of traditional responsibilities of both the trial courts and appellate courts.

I believe the opinion of the Court of Appeals is proper, and the Court of Appeals did review the sufficiency of the evidence. The majority states the Court of Appeals "may have made findings of its own." I do not read the Court of Appeals opinion that way; it simply stated the conduct here did not rise to the level of "wanton and reckless indifference."

The second part begins by engaging in fact finding which, as far as I can tell, is not supported by the record.

The testimony of the employee who answered the call was that he smelled gas in the house, as Mrs. Horton did. He closed the damper in the fireplace and said the smell diminished to a slight odor. Where is the evidence that he "erroneously concluded that there was no gas leaking inside the house..."? It is more likely that the hot fireplace was pulling gas into the home from the outside, and closing the damper stopped this. There is no indication that use of the "explosive meter" would have revealed anything unusual at this time. After all, it was more than an hour after the initial inspection that the explosion occurred.

The opinion then makes a finding of fact as to the origin of the explosion. I agree with the conclusion that the gas accumulated in the attic, but in order for the coals in the fireplace to have caused the explosion, there would have had to have been an explosive mixture in the house itself. We were told there were no serious injuries from the explosion and no serious burns.

This fact alone indicates ignition in the attic instead of the house proper. A gas explosion is a flash flame which, if it occurred in the house, would have in all probability burned to death each member of the family.

With this scenario, the majority refers to the testimony of Murphy as the most damaging. As inspector of the Public Service Commission, he had made certain recommendations to management. He had a model plan which he submitted to the company. The record does not reveal that this plan was other than a personal idea on Murphy's part. According to the record, the company was in compliance with all pertinent safety rules and regulations of the Public Service Commission. My opinion is that all of this testimony by Murphy is incompetent, and further I do not see how a series of rules would have prevented the accident. If, as it seems most likely, the explosion occurred in the attic, use of the "explosive meter" would not have detected any appreciable amount of gas in the house. The only way an explosive mixture of gas could have been found was in checking the attic. This was not done in the mistaken belief that the exhaust fan vented to the outside instead of into the attic.

There is no question that this state of facts authorized the trial court to submit the case on ordinary negligence. Even the majority does not say that the employee at the scene was guilty of gross negligence, only reasonably arguable that it could have been considered so by the jury, whatever that means. It is absurd to say that the employee who answered the call could have been any more than ordinarily negligent. The other employees outside who did not cut off the gas or order evacuation did not know of gas in the house, so far as I can tell from the record, so I fail to see the significance of this statement.

Then the opinion proceeds to invent a new standard for gross negligence. We go from asserted negligence of employees at the scene who are presumed to have known of a dangerous condition to the policy and procedures of the company in training its employees in order to make out a submissible case on gross negligence. Then we have the novel theory of adding together several ordinary negligence factors to make out a case of gross negligence.

The majority then adopts with approval *Brown v. Riner*, Wyoming, and lifts out of context a sentence from the opinion. That

opinion concerned a guest-passenger automobile accident, and the several acts were all in one, speeding, bizarre driving, ending in hitting an abutment, and drinking beer and wine. That is a far cry from the circumstances here. The majority opinion places this jurisdiction alone in formulating a standard for gross negligence.

If this case involves gross negligence, then a multitude of cases not ordinarily thought of as gross-negligence cases will qualify.

As to the third part, I do not care to express in this case my views on whether there should be a change in the law of punitive damages.

Accordingly, I dissent.

VANCE, Justice, dissenting.

I respectfully dissent. Historically, punitive damages have been allowable in Kentucky for tortious conduct that is willful, malicious, and without justification. *Shields' Adm'rs v. Rowland*, 151 Ky. 136, 151 S.W. 408 (1912). Malice may be implied from outrageous conduct as long as the conduct is sufficient to evidence *conscious* wrongdoing. *Hensley v. Paul Miller Ford, Inc.*, Ky., 508 S.W.2d 759 (1974).

Conduct which evidences conscious wrongdoing in my mind is limited to either (1) intentional wrongdoing, or (2) conduct which is so inherently dangerous to the lives and safety of others that the actor is bound to have known and recognized the likelihood of such harm but nevertheless engaged in the conduct without regard for its consequences.

I think the same standard should be applied to negligent conduct which can be said to justify punitive damages. It should be so inherently dangerous to the lives and safety of others as to warrant the conclusion that if the actor did not actually intend the injury that flowed from his conduct, he must necessarily have recognized the danger of such harm, and notwithstanding the danger, have engaged in the conduct without regard for its consequences.

I do not find in the evidence in this case any evidence that the employee who first answered the service call was aware of the danger. He thought the gas had entered the house through a chimney. He thought the kitchen exhaust fan would remove any gas from the house. He thought that closing the damper in the fireplace would prevent further gas from entering the house. He did not think the situation was dangerous. Even though he may have been mistaken in these matters, there is nothing to suggest he intended to cause injury, that his actions were malicious, or that the circumstances were such that he must have known, but just didn't care, about the danger to others. In my view, this employee was entitled to a directed verdict on the issue of punitive damages.

The same is true of the employees who were called to repair the leak in the gas line near the driveway. The majority opinion states that evidence justified a belief that the employees were aware that gas had escaped into the house, was probably still there, and still leaking into the house. I do not find such evidence in the record. Admittedly, one employee was aware that some gas had leaked into the house. He took measures which he thought would prevent further gas from entering the house and would expel that which had already entered. I find no evidence that he, or any other employees, knew that gas was still in the house and still leaking into the house some two hours later when the explosion occurred.

Rather than a case of proceeding ahead while aware of the danger without regard for the lives and safety of others, it seems to me this was a case of proceeding ahead entirely oblivious of any danger to the lives and safety of others.

I agree with Justice STEPHENSON that the testimony of Ernest Murphy was not relevant. He had devised a plan for training company employees. The company had its own plan. No law or regulation required the use of Murphy's plan, and it is pure speculation to assume that the accident would not have happened if the com-

pany had put into effect the plan devised by Murphy.

I would affirm the award of compensatory damages and reverse the award of punitive damages.