**Steven B. HUDDLESTON, a minor By and Through his parent and next friend, Pearl (Huddleston) LYNCH and Pearl (Huddleston) Lynch, Individually, Appellants,**

v.

**Most Reverend William A. HUGHES, Roman Catholic Bishop of the Diocese of Covington, Kentucky, Appellee.**

No. 91–CA–000976–MR.

Court of Appeals of Kentucky.

Dec. 4, 1992.

Robert E. Sanders, John M. Dosker, Sanders, Dosker & Associates, Covington, for appellants.

Jeffrey C. Mando, Donald L. Stepner, Adams, Brooking, Stepner, Woltermann & Dusing, Covington, for appellee.

Before GUDGEL, HAYES and HUDDLESTON, JJ.

HUDDLESTON, Judge.

Steven Huddleston (a minor at the time this action was filed) and his mother Pearl (Huddleston)[1] Lynch appeal from a summary judgment dismissing their personal injury action against the Most Reverend William A. Hughes, Roman Catholic Bishop of the Diocese of Covington, Kentucky. Because we agree that Kentucky's "Recreational Use Statute" (KRS 411.190) has application to the defendant, we affirm that aspect of the judgment below. We however believe a jury question does exist regarding whether the defendant's actions were "willful or malicious" as described under the Recreational Use Statute, and therefore exempt from immunity. We ac-cordingly reverse and remand for a jury trial on this question.

Covington Latin School is a Roman Catholic college preparatory school located at Eleventh Street and Madison Avenue in Covington, Kentucky, next to the Cathedral Basilica. In front of the school and immediately north of the cathedral is a parking lot/playground. This property is used as the school's outdoor recreation area during the school year, and as a parking lot for church services and other functions. All the aforementioned property is owned by the Diocese of Covington and titled in the name of Bishop Hughes.

At the time the incident in question occurred, there were two free-standing basketball goals located in the northwest corner of the playground. The basketball goals consisted of backboards with metal rims and nets erected on a tubular metal frame anchored by a heavy supporting apparatus. The goals were not cemented to the pavement. Evidently to prevent the goals from tipping forward or being pulled down, the Bishop's employees or agents placed large pieces of concrete at the base of each goal to serve as counter-weights. Chains were also used to secure the goals to an abutting wrought-iron fence. On the day Steven Huddleston was injured, however, no chain was in use.

Neighborhood children could enter the Covington School playground from an alley to the rear of the school and Basilica, and from separate gates located on Eleventh Street and Madison Avenue. Testimony revealed that the Covington School students and neighborhood children would often remove the counter-weights from the base of the basketball goals so that the assembly could be tilted forward and the rim lowered, facilitating "slam-dunking."

On June 16, 1988, Steven Huddleston and two friends went to the Covington School to play basketball. As was the custom, they removed the cement counter-weights from the goal's base so they could "dunk" more effectively. Huddleston was standing under the goal as his friends shot bas-

1. The appellants are not related to the presiding appellate judge.

kets. Evidently without warning, the goal and its supporting structure fell on Huddleston from behind. The goal struck Huddleston in the back and knocked him to the ground, pinning him between the apparatus and the pavement. Huddleston's back was broken in the incident.

In April 1989, Huddleston filed an action against Bishop Hughes on theories of premises liability and attractive nuisance. In February 1991, the Bishop moved for summary judgment based on Kentucky's "Recreational Use Statute" (KRS 411.190). After reviewing the record and hearing oral argument, the trial court granted the Bishop's motion.

The trial court found that there was no genuine issue as to any material fact and that, accordingly, KRS 411.190 barred Huddleston's claim. Huddleston filed a motion to alter, amend or vacate summary judgment, contending:

(1) Genuine issues of material fact exist regarding whether the Defendant's failure to guard or warn against the dangerous condition was willful or malicious, and also whether Defendant was actively negligent; (2) K.R.S. 411.190 does not apply to the facts of this case to protect the landowner and that the attractive nuisance doctrine should apply, and; (3) That K.R.S. 411.190 is unconstitutional.

The court denied Huddleston's motion. This appeal followed.

In *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476 (1991), Kentucky's Supreme Court embraced the test articulated in *Paintsville Hospital Co. v. Rose*, Ky., 683 S.W.2d 255 (1985), as providing the authoritative standard for assessing summary judgment motions. *Steelvest* thereby establishes a rigorous burden that must be met by a party endeavoring to secure a summary judgment:

The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor.... Even though a trial court may believe the party opposing the motion may not succeed at trial, it should not render a summary judgment if there is any issue of material fact.... The trial judge must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists. It clearly is not the purpose of the summary judgment rule, as we have often declared, to cut litigants off from their right of trial if they have issues to try. * * * Only when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor should the motion for summary judgment be granted.

*Steelvest*, 807 S.W.2d at 480, 482 (Citations omitted).

KRS 411.190, Kentucky's "Recreational Use Statute," provides:

(2) The purpose of this section is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes.

(3) Except as specifically recognized by or provided in subsection (6), an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes.

(4) Except as specifically recognized by or provided in subsection (6), an owner of land who either directly or indirectly invites or permits without charge any person to use such property for recreational purposes does not thereby:

(a) Extend any assurance that the premises are safe for any purpose.

(b) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed.

(c) Assume responsibility for or incur liability for any injury to person or property caused by an act or omission of such persons.

*Coursey v. Westvaco Corp.*, Ky., 790 S.W.2d 229, 232 (1990), has held that to enjoy the immunity provided by KRS 411.-190, a landowner:

... must show he knew and condoned the public making recreational use of his property, and by the landowner's words, actions or lack of action it must be able to be reasonably inferred the landowner intended to permit such use.   * * *  In lieu of a formal dedication, we hold that a landowner must at a minimum show he knew and condoned the public making use of his land for a recreational purpose, and by the landowner's words, actions or lack of action it must be able to be reasonably inferred the landowner intended to put his land to such use.

Bishop Hughes contends that as part of a "good neighbor policy" the gates to the Covington Latin School's parking lot/playground were left open continuously to allow free public access to the school's recreational facilities, thereby bringing the property into the protections provided by KRS 411.190. The trial court obviously agreed with Bishop Hughes. Huddleston did, however, endeavor to present evidence challenging the Bishop's position.

Father Edwin D. Heile, who worked at the Covington School from 1960 to 1983, serving as headmaster for the last ten years of his tenure, testified as follows:

Q   In fact, you all, I gather, intentionally left the Latin school parking lot gates open recognizing kids were going to play on them anyway and just left the gates open to let them play on them, true?

A   Well, I wouldn't say we left the gates open to let them play on them. They'd climb over if you closed them so it didn't make much difference. It was safer for them to walk in than it was to climb over.

Robert Larcher, principal at Covington School, provided this testimony:

Q.  Jim Richter, your dean, did he claim to know anything about any of these topics, or anything else that directly or indirectly related to this case?

A.  I think, I believe Jim was one of the—I believe Jim was telling me about sort of an open-playground policy, and that sometime during the period that he was at school—or, maybe it was another

teacher, there was an attempt to close it off, but that created more problems, some vandalism, graffiti, so on and so forth, so that the playground was never closed off, barricaded, or anything like that.

In his answer to Huddleston's complaint, Bishop Hughes refers to Huddleston as a "trespasser"—

5.  That the Plaintiff, Steven B. Huddleston, was a trespasser to the area in which his alleged injuries and/or damages occurred and therefore was owed no duty of reasonable care by the Defendant, pursuant to KRS 381.232[.]

An allusion to Huddleston's trespasser status is also found in the Bishop's answer to an interrogatory:

19.  Describe any information you have indicating, or any reason you have to believe, that Plaintiff, Steven B. Huddleston, was a trespasser to the area where he was injured.

ANSWER: He did not have *express permission* to play on the lot (Emphasis supplied).

Huddleston also offered evidence indicating that the gates to the playground/parking lot *could not* be closed, due to resurfacing work done on the lot.

■■■  Although it is a close call, even under the stringent standard established in *Steelvest* we must hold that summary judgment for the defendant was appropriate on this issue. Given the evidence that Huddleston managed to adduce, no jury could reasonably determine that the Covington School did not know and condone the public's making recreational use of its property. Father Heile's testimony indicating contra is irrelevant, since he left his post at the school some five years before the incident in question occurred. Although the school made references early on in the litigation to Huddleston's "trespasser" status, it quickly abandoned this position as the litigation progressed. Pleading in the alternative is of course a standard legal practice, and absent extraordinary circum-

stances such alternative pleading is not binding as a judicial admission.[2]

We note that in its answer to an interrogatory regarding trespass, the school stated that Huddleston did not have "express permission" to use the playground. The trial court's summary judgment on the applicability of the Recreational Use Statute is clearly predicated on the theory that Huddleston and other members of the public had *implied permission* to use the playground, a theory that is unassailably supported by the evidence. The fact that the gates to the playground would *not close* does nothing to establish that the school has not given implied consent for the use of its property; indeed, if anything it tends to indicate the opposite.

Kentucky's Recreational Use statute provides at KRS 411.190(6):

Nothing in this section limits in any way any liability which otherwise exists:

(a) For willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity.

The meaning of the phrase "willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity" as used in KRS 411.190(6) is an issue of first impression in the Commonwealth.

*Black's Law Dictionary* defines a "willful" act as:

Proceeding from a conscious motion of the will; voluntary; *knowingly;* deliberate. Intending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary.

Premeditated; malicious; done with evil intent, or with a bad motive or purpose, *or with indifference to the natural consequences;* unlawful; without legal justification.

*Black's Law Dictionary,* 1599 (6th ed. 1990) (Emphasis supplied).

As noted above, the terms "willfully" and "knowingly" are often used interchangeably. Kentucky's Penal Code defines "knowingly" as follows: "a person

acts knowingly with respect to conduct or to a circumstance ... when he is aware that his conduct is of that nature or that the circumstance exists." KRS 501.020(2). *Black's Law Dictionary* defines "knowingly" in a similar fashion:

With knowledge; consciously; intelligently; willfully; intentionally. An individual acts "knowingly" when he acts with awareness of the nature of his conduct. * * * Act is done "knowingly" or "purposely" if it is willed, is product of conscious design, intent or plan that it be done, and is done with awareness of probable consequences.

*Id.* at 872 (Citations omitted).

Kentucky's highest court observed in *Louisville & N.R. Co. v. George,* 279 Ky. 24, 129 S.W.2d 986 (1939), that:

[T]o constitute *willful* or wanton negligence *it is not necessary to show ill will toward the person injured, but an entire absence of care for the life, person, or property of others which exhibits indifference to consequences makes a case of constructive or legal willfulness.*

*Id.* 129 S.W.2d at 989 (Citation omitted) (Emphasis supplied).

KRS 411.184, addressing punitive damages, defines "malice" as meaning:

[E]ither conduct which is specifically intended by the defendant to cause tangible or intangible injury to the plaintiff or conduct that is carried out by the defendant both with a flagrant indifference to the rights of the plaintiff and with a subjective awareness that such conduct will result in human death or bodily harm.

Addressing punitive damages generally, the Supreme Court in *Horton v. The Union Light, Heat & Power Co.,* Ky., 690 S.W.2d 382, 389 (1985), cites the *Restatement (2d) of Torts* § 908(2) (1979) and makes the following observation:

"[E]vil motive" and "reckless indifference to the rights of others" are considered as synonymous. * * * [N]egligence when gross has the same character of outrage justifying punitive damages as

---

**2.** See *Goldsmith v. Allied Building Components,* Ky., 833 S.W.2d 378 (1992).

does willful and malicious misconduct in torts where the injury is intentionally inflicted. Just as malice need not be expressed and may be implied from outrageous conduct, so too may wanton or reckless disregard for the lives and safety of others be implied from the nature of the misconduct.

*R.B. Tyler Co. v. Kinser*, Ky., 346 S.W.2d 306, 308 (1961), holds that "malice is imputed where the wrongful act evidenced the entire want of care or great indifference to the consequences and the rights of others." *Black's Law Dictionary* 956–957, similarly, acknowledges that the term "malice" need not be used exclusively to characterize a deliberate intent to do harm:

> Malice in law is not necessarily personal hate or ill will, but it is that state of mind which is reckless of law and of the legal rights of the citizen.

*Black's* defines a "willful and malicious injury" as follows:

> For such to exist there must be an intent to commit a wrong either through actual malice or from which malice will be implied. Such an injury does not necessarily involve hatred or ill will, as a state of mind, but arises from intentional wrong committed without just cause or excuse. * * * *It may involve merely a willful disregard of what one knows to be his duty,* an act which is against good morals and wrongful in and of itself, and which necessarily causes injury and is done intentionally.

*Id.* at 1600 (Citation omitted) (Emphasis supplied).

▇▇▇ Consequently, although we agree with Bishop Hughes that nothing in the record remotely suggests that the Covington School "deliberately intended" to harm Huddleston, we disagree that the terms "willful or malicious" necessarily and solely entail an "intention to do wrong and inflict an injury." We accordingly believe a jury question exists regarding whether the School acted "with indifference to the natural consequences" of its actions in continually re-setting the goals with only perfunctory precautions taken. A jury question exists regarding whether the School "evidenced the entire want of care or great indifference" to Huddleston's safety.

The evidence is uncontradicted that the basketball goal in question had fallen on a number of occasions, yet each time it was set upright with no additional security in place to prevent a recurrence. It is conceded that children playing basketball on the Covington School parking lot often attempted to "slam-dunk" basketballs by removing the counter-weights balancing the free-standing goals, or by otherwise tilting the goals forward.

Principal Larcher testified:

Q. Did [the school custodian] tell you that he was aware that those goalposts and their supporting apparatuses had fallen on other occasions prior to that date that Steve Huddleston was injured?

A. I believe so. I believe he mentioned something about trying to weight it down. In one instance, he would chain it down, the kids cut the chain, or something like that.

We note, again, that no chain was securing the goal on the day Huddleston was injured.

Former headmaster Father Heile also admitted knowledge of the dangerous play taking place at the goals:

Q You all knew and understood and anticipated that kids would try to slam-dunk the ball and would at times jump up and grab onto the rims and hang on?

A Oh yeah. Our own students even did it.

There is no evidence that a warning was posted regarding the hazards connected with the goals on the day Huddleston was injured, or that a warning had ever been posted. In an affidavit attached to Huddleston's motion to alter, amend or vacate summary judgment, Covington School custodian Anthony Tuemler acknowledges that the goal that fell on Huddleston had fallen on other occasions. He further states that on each occasion it had been set back up without any additional measures being employed to prevent the goal from falling

again.[3] Tuemler notes that a number of school employees and officers were aware of the hazards connected with the goals. Indeed, Tuemler states that he "believes" the goal that injured Huddleston had most recently fallen "a day or so before [it] fell on Steve Huddleston."

Even without Tuemler's testimony, we believe the Larcher and Heile statements present a question of material fact regarding whether the school willfully or maliciously failed to guard or warn against a dangerous condition, use, structure, or activity, KRS 411.190(6)(a).[4]

■ Since our Supreme Court has held KRS 411.190 to be constitutional in *Sublett v. United States*, Ky., 688 S.W.2d 328, 329 (1985), we reject as moot Huddleston's arguments attacking the statute's constitutionality. See SCR 1.030(8)(a); *Commonwealth v. Basnight*, Ky.App., 770 S.W.2d 231, 238 (1989). We need not decide whether the issue of the statute's constitutionality was properly preserved in this appeal.

The judgment below is affirmed in part, reversed in part, and this case is remanded for proceedings consistent with this opinion.

HAYES, J., concurs.

GUDGEL, J., concurs by separate opinion.

GUDGEL, Judge, concurring by separate opinion:

Although I concur in most of the majority opinion, I write separately for the limited purpose of expressing my individual reasons for concluding that there is a genuine issue of material fact as to whether the conduct of appellee's agents amounted to a "willful" failure to guard or to warn against a dangerous structure at the Covington School playground for purposes of KRS 411.190(6).

In my view, the majority has overlooked a controlling precedent in which our supreme court adopted a definitive definition of the word "willful." In *Kirschner v. Louisville Gas & Electric Company*, Ky., 743 S.W.2d 840 (1988), the court was called upon to construe KRS 381.232 as it pertains to intentionally-inflicted injuries. In doing so, the court expressly adopted Professor Prosser's definition of the word "willful" as follows:

This type of conduct has been defined in Prosser & Keeton on the Law of Torts, 5th Ed. (1984), Chapt. 5, Sec. 34, pp. 212–213 as:

... They apply to conduct which is still, at essence, negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if it were so intended....

The usual meaning assigned to "willful," "wanton," or "reckless," according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences....

*Id.* at 842–843.

Here, although it is highly doubtful that a jury will conclude that appellee's agents were consciously indifferent to the consequences of permitting children to remove the chain and the concrete weights from the back of the offending basketball goal, I am constrained to conclude that the record creates a genuine issue of material fact in this vein which is sufficient to withstand a motion for summary judgment when tested by the *Steelvest, supra,* standard. However, unlike the majority, I would direct that the issue of whether appellee's conduct was "willful" should be submitted to the jury pursuant to Prosser's definition of that word as adopted in *Kirschner,* rather

---

3. Tuemler mentions that the goals could have been cemented to the pavement.

4. Huddleston submits that the school's practice of repeatedly repositioning the goal with no warning posted or additional precautions taken constitutes, "in effect, resetting the trap." This is a question for a jury.

than pursuant to the different definition of the word as promulgated in the majority opinion. To do otherwise violates the rule requiring us to follow existing supreme court precedents. SCR ·1.030(8)(a).

Further, I fail to perceive that there is any issue of fact as to whether the conduct of appellee's agents for purposes of the statute was malicious rather than willful. In the first place, the words "willful" and "malicious" are used in the statute in a mutually exclusive sense, as demonstrated by the fact that they are separated by the disjunctive word "or," which ordinarily is used to connote exclusivity. Further, although the words "malicious" and "willful" are similar, they certainly are not synonymous and they should not be treated as having an identical legal meaning. Indeed, the word "malicious" has generally been defined in the law as involving a state of mind which is characterized by, or which involves acts which are done with, wicked or evil intentions. *See, e.g., Black's Law Dictionary* (6th ed. 1990). Such a state of mind is clearly much more egregious and culpable than that which is implicated by a mere "willful" act. Moreover, in my opinion there is no evidence in the record sufficient to support a finding that the conduct of appellee's agents was motivated by a "malicious" state of mind. To conclude otherwise, as the majority has done, is both unjustified and unwarranted. Thus, although I concur in the result reached by the majority, I would remand this action for a trial as to the limited issue of whether the actionable conduct of appellee's agents was "willful." Further, in submitting this issue to the jury, I would direct the court to define the word "willful" in accordance with its definition as adopted by the supreme court in *Kirschner, supra.*