The KROGER COMPANY, Appellant,

v.

Andrew WILLGRUBER, Appellee.

No. 94–SC–1037–DG.

Supreme Court of Kentucky.

April 25, 1996.

John D. Cole, Dov Moore, Cole, Moore & McCracken, Bowling Green, Gary L. Greenberg, Denlinger, Rosenthal & Greenberg, Cincinnati, Ohio, for Appellant.

Steven D. Downey, Hixson, Downey and Travelsted, Bowling Green, for Appellee.

KING, Justice.

The appellee, Andrew Willgruber, was employed by the appellant, the Kroger Company. After 32 years of employment, Willgruber was fired. He brought suit in the Warren Circuit Court. At the conclusion of a trial by jury, judgment was entered in the collective sum of $750,400.00 for his claim of breach of contract, intentional infliction of emotional distress and punitive damages. The Court of Appeals affirmed the judgment

and we granted discretionary review. We affirm the Court of Appeals.

At the age of 18 Willgruber began working for Kroger. In 1983, at the age of 41, he was promoted to National Sales Manager of Country Oven Bakery, a manufacturing facility located in Bowling Green. He consistently received positive employment evaluations and the bakery prospered under his sales direction. In 1990, Willgruber came into conflict with a new marketing manager who ordered him to contact competitors and obtain their price lists in order to set Country Oven's prices. Willgruber refused citing Kroger's ethics policy and employment manual as well as the advice of Kroger's corporate counsel. Willgruber was ordered by the plant manager to comply. Ultimately, he relented and set the prices as ordered.

Unknown to Willgruber, his plant manager wrote fictitious monthly evaluation reports describing Willgruber's alleged poor job performance. On December 19, 1990, Willgruber attended a Christmas luncheon with the plant manager and Mr. Wayne Neal, one of Kroger's senior personnel officers. At the meeting, without warning, Willgruber was presented with a resignation letter and possible severance package. However, in order to qualify for the severance package, he was required to sign a release forever discharging Kroger for any and all liability arising from his separation from the company. As an added inducement to sign the release, Willgruber was assured of a job as assistant sales manager at Anderson Bakery, located in South Carolina. He was given 21 days to resign and sign the release or be fired.

Although Willgruber made no decision at the luncheon, when the plant manager returned to the plant, he told Willgruber's co-workers that Willgruber had resigned. Three days later Willgruber was forced to clean out his desk while friends and co-workers looked on. Shortly thereafter, Willgruber telephoned Neal inquiring about the job offer proposed during the December 19, 1990 meeting. He informed Neal that he was "mighty upset, mighty sick" over the situation but wanted to interview for the assistant sales manager position in South Carolina. He flew to South Carolina and met Mr. Jack Rosenberger, the Anderson plant manager. Rosenberger testified that he alone was solely in charge of hiring and that he never authorized anyone to make a job offer to Willgruber. Furthermore, he testified the plant had never had an assistant sales manager position.

Immediately upon his return from the Anderson, South Carolina, trip, Willgruber had a dramatic, emotional breakdown. His wife testified how she found him on the living room floor saying "there is no job there for me". Upset and concerned for her husband, Mrs. Willgruber telephoned Neal and described her husband's collapse and inability to cope. Neal told Mrs. Willgruber to get her husband help and that her husband needed to "sign the papers". Mrs. Willgruber took her husband to a psychotherapist who found Willgruber to be suffering from severe, disabling depression.

Unable to work, Willgruber applied for disability benefits with his disability insurance carrier. Neal sought to persuade the carrier to deny Willgruber benefits by providing it with "inaccurate" information. After a period of four months, the carrier concluded it was legally obligated to pay Willgruber disability benefits, but Neal then demanded the carrier undertake surveillance of Willgruber.

At trial, Willgruber described the next two years of his life as a "living hell". He recounted his physical sickness, emotional pain, inability to eat or sleep, his feelings of hopelessness and worthlessness, and when things became totally unbearable, his attempt at suicide. He also explained the impact his condition had on the lives of his wife and three sons. His description of his condition was corroborated by the testimony of medical witnesses.

The jury found that Kroger wrongfully terminated Willgruber from his employment on December 19, 1990, and awarded Willgruber $180,400.00 for his claim of wrongful discharge. Kroger has satisfied this portion of the judgment and therefore, no portion of that claim, or the facts supporting it, are in dispute. Kroger does, however, dispute the jury award for intentional infliction of emo-

tional distress and thus the punitive damages awarded.

## I.  PREEMPTION BY WORKERS COMPENSATION ACT

Kroger argues that Willgruber's claim for intentional infliction of mental distress is preempted because the Workers Compensation Act is the exclusive remedy for an injury arising out of and in the course of a worker's employment.  However, we need not decide this issue because Kroger's conduct which forms the basis of Willgruber's claim for the tort of intentional infliction of emotional distress occurred after its employment relationship with Willgruber had terminated.

Kroger's conduct following Willgruber's discharge was motivated to absolve itself from liability for its wrongful termination of the employment relationship and was separate and apart from its employment relationship with Willgruber.  As described in detail below, Kroger's post-termination conduct was so compellingly egregious that it alone justified the submission of this matter to the jury.

■  Evidence pertaining to Kroger's actions before Willgruber's termination of employment was relevant to his claim of wrongful discharge.  On appeal, for the first time, Kroger contends that any post-termination injuries Willgruber received "were intertwined with injuries caused before [or] by the termination itself ..." If there was a question of fact concerning the impact of Kroger's pre-termination conduct on Willgruber, this issue could have easily been resolved by an appropriate instruction.  It was incumbent upon Kroger to seek such an instruction.  Kroger failed to raise the issue at trial and is precluded from doing so on appeal.  CR 51(3).

## II.  DIRECTED VERDICT

Kroger maintains the trial court erred by not granting it a directed verdict on Willgruber's claim of intentional infliction of mental distress.  It also argues that because it was entitled to a directed verdict on this claim no punitive damage instruction was warranted.

■  The appropriate test for the trial court to apply when ruling upon a motion for directed verdict is clearly set forth in *Spivey v. Sheeler*, Ky., 514 S.W.2d 667, 673 (1974):

> In ruling upon a motion for directed verdict, the trial court must "draw all fair and rational inferences from the evidence in favor of the party opposing the motion, and a verdict should not be directed unless the evidence is insufficient to sustain the verdict.  The evidence of such party's witnesses must be accepted as true."

In *Horton v. Union Light, Heat & Power Co.*, Ky., 690 S.W.2d 382, 385 (1985), we described the role of an appellate court in determining if the evidence presented at trial is legally sufficient to overcome a directed verdict.  In *Horton*, we underscored the deference to be given the jury's determination of conflicting facts and the reasonable inferences drawn from the facts.  In *Horton*, we stated:

> The role of the appellate court when deciding negligence issues of this sort is limited to viewing the evidence from a standpoint most favorable to the prevailing party.  [citations omitted] ... The verdict of the jury resolves any conflicts in the testimony and also any conflicts in the reasonable inferences to be drawn from the testimony in favor of the prevailing party.

The tort of intentional infliction of emotional distress has been evolving over the past century.  At first the courts refused to permit recovery for "mental pain or anxiety" and adopted the view of Lord Wensleydale on the belief that "the law cannot value and does not pretend to redress, when the unlawful act complained of causes that alone". *Lynch v. Knight*, 9 H.L.C. 557 at 598, 11 Eng.Rep. 854 (1861).

Damages for mental anguish were previously recoverable only as "parasitic" damages to physical injury and a previously recognized tort, such as assault, battery or false imprisonment.  Gradually, courts began to allow damages for mental anguish when the accompanying physical injury was slight or virtually non-existent.  Scholars chronicled the development of the law in this area and lamented over the hypocrisy of the legal standard.  Throckmorton, "Damages for

Fright", 34 Harv.L.Rev. 260 (1921); and Magruder, "Mental and Emotional Disturbance in the Law of Torts", 49 Harv.L.Rev. 1033 (1936).

In his 1939 article, "Intentional Infliction of Mental Suffering: A New Tort," 37 Mich. L.Rev. 874, Dean William L. Prosser encouraged the courts to provide clarity and "to jettison the entire cargo of technical torts with which the real cause of action has been burdened." *Id.* at 892.

> It is time to recognize that the courts have created a new tort. It appears, in one disguise or another, in more than a hundred decisions, the greater number of them within the last two decades.... It consists of the intentional, outrageous infliction of mental suffering in an extreme form. *Id.* at 874.

The essence of the tort was capsulized by Dean Prosser when he wrote that "if a name must be found" for this new tort "we might do worse than to borrow a word from the vernacular of Kentucky" and call it "orneriness". *Id.* at 874. Since Prosser's landmark law review article the tort has been denominated in an equally descriptive manner, the tort of outrage.

In 1948, in Section 46 of the *Restatement (Second) of Torts*, the American Law Institute recognized the existence of an independent cause of action for the intentional infliction of emotional distress. Recognition of the tort by the drafters of the *Restatement* led to its acceptance by the courts, "the elements of the tort as described in the Restatement being widely accepted and quoted." "Annotation: Modern Status of Intentional Infliction of Mental Distress as Independent Tort; 'Outrage,'" 38 ALR 4th 998, 1003 (1985). As of 1985, most jurisdictions had expressly recognized the existence of this tort. *Id.*

Our Commonwealth first adopted the tort of intentional infliction of mental distress in the case of *Craft v. Rice,* Ky., 671 S.W.2d 247 (1984). In *Craft,* we adopted *Restatement (Second) of Torts,* section 46, and recognized the elements of proof necessary for this new tort:

1. The wrongdoer's conduct must be intentional or reckless;

2. The conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;

3. There must be a causal connection between the wrongdoer's conduct and the emotional distress; and

4. The emotional distress must be severe.

*Craft,* 671 S.W.2d at 249.

These four elements were fully reflected in the jury instructions given by the trial court in this case. Kroger complains that the evidence was legally insufficient to support the second element: that its conduct offended generally accepted standards of decency and morality. Kroger does not complain regarding the other three necessary elements.

Initially courts were reluctant to recognize the tort of outrage because of a concern with opening the door to "litigation in the field of trivialities and mere bad manners." *Prosser and Keeton on the Law of Torts,* p. 56 (5th Ed., Lawyer's Ed., 1984). "Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better protection than the law could ever be." Magruder, *supra,* 49 Harv.L.Rev. at 1035.

Citizens in our society are expected to withstand petty insults, unkind words and minor indignities. Such irritations are a part of normal, every day life and constitute no legal cause of action. It is only outrageous and intolerable conduct which is covered by this tort. It was in recognition and acceptance of this reasoning that we held in *Humana v. Seitz,* Ky., 796 S.W.2d 1 (1990), that the facts presented there failed to meet the threshold requirements of the tort of intentional infliction of mental distress.

In *Seitz* the plaintiff was admitted to a hospital for pregnancy complications involving a ruptured membrane. Her claim consisted of four parts. First, she believed her hospital room intercom had been deliberately disconnected. She offered no proof and we pointed out that an unsupported belief does not create an issue of material fact. Second-

ly, Ms. Seitz alleged there was a 12–15 minute delay from the time she went into delivery and when the nurses arrived in her room. We underscored that such a delay "may well be negligence, but it is hardly intentional, outrageous or reckless conduct." *Id.* at 3. Thirdly, a nurse told Ms. Seitz to "shut up," and lastly, another nurse told her that the hospital would dispose of her dead baby. We recognized that these statements were curt and lacked sensitivity but that they were neither extreme nor outrageous nor did they intentionally or recklessly cause severe emotional distress. Accordingly, we held that such conduct fell short of the standard set forth in *Craft.*

In *Craft*, the tortfeasor's outrageous and intolerable conduct against Mrs. Craft consisted of: (a) keeping her under surveillance; (b) telling her on the CB radio that her husband would be put in jail; and (c) driving so as to force her into an opposing lane of traffic. We also held Mr. Craft likewise had a claim even though the actions taken against him consisted only of threats made to him over the CB radio.

Today we are again called upon to explore the legal contours of the emerging tort of intentional infliction of mental distress. We must determine if the facts of this case are sufficient to meet the legal threshold and overcome a directed verdict. For purposes of this analysis, we only consider those events which occurred after Willgruber's employment was wrongfully terminated on December 19, 1990.

Willgruber presented compelling, poignant proof from which the jury reasonably concluded that Kroger engaged in a calculated attempt to coerce him to sign release papers exonerating Kroger for its wrongful discharge of Willgruber. Construing the facts in a light most favorable to Willgruber, his proof of intentional infliction of mental distress was sufficient to submit the matter to the jury.

In order to induce Willgruber to sign a full release, Kroger repeatedly misrepresented to Willgruber that he would be eligible for the position of assistant sales manager at the Anderson Bakery, knowing full well that no such position was available. Despite its knowledge that Willgruber was "mighty upset, mighty sick" it proceeded with sending Willgruber to Anderson, South Carolina, fully cognizant that no job would materialize. When Willgruber returned home, he suffered a complete mental breakdown. This was brought to Neal's attention by Mrs. Willgruber the night Willgruber became ill. Neal pressured Mrs. Willgruber to have her husband "sign the papers". The next morning Neal telephoned the Anderson, South Carolina, plant and falsely stated that Willgruber had no interest in the job.

As a result of Kroger's actions, Willgruber experienced real and disabling depression. His psychotherapist recommended that he be placed on total disability. Realizing Willgruber was without income, Neal had conversations with the disability insurance company's representatives calculated to wrongfully defeat or delay the payment of disability benefits to which Willgruber was entitled. These statements included untruthful allegations that Willgruber: (1) was very persuasive and was feigning illness; (2) was working for another company and clandestinely taking money "under the table"; and (3) items of a personal nature so derogatory to Willgruber and his family that they are unworthy of repetition in a published opinion.

Neal's plan, to delay the payment of disability benefits, had its desired effect of causing Willgruber further anguish. In fact, this anguish was so severe that the disability insurance company's own examining physician found it medically necessary to engage Willgruber in a non-suicide pact.

Despite Neal's interference, eventually the disability carrier approved Willgruber's disability claim. When informed of this, Neal demanded that the carrier conduct surveillance of Willgruber. He personally sent a written description and photograph of Willgruber to assist in the surveillance. It was well within the jury's province to conclude that the exclusive reason for demanding surveillance was yet another attempt to deny or delay Willgruber the disability benefits to which, at this time, he was clearly entitled and force him to sign the release documents

absolving Kroger of liability for its wrongful discharge.

Comment f to section 46 of the *Restatement (Second) of Torts* provides that extreme and outrageous behavior "may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity". Kroger was well aware of Willgruber's precarious emotional health. It possessed extensive and current information concerning the status of his depression as well as those factors having the greatest impact on his emotional well being: his employment opportunities and financial plight. The jury was justified in concluding that despite this knowledge of susceptibility, or perhaps because of it, Kroger continued its course of conduct calculated to exert more pressure on Willgruber in order to make him acquiesce to Kroger's demand of signing the release papers.

Kroger's actions did not constitute some petty insult, minor indignity or impolite triviality. Nor was its conduct typical of what occurs when an employment relationship ends. The jury had a right to conclude that this was a plan of attempted fraud, deceit, slander, and interference with contractual rights, all carefully orchestrated in an attempt to bring Willgruber to his knees. Conduct such as this constitutes the very essence of the tort of outrage. It is precisely what Dean Prosser had in mind when he wrote almost sixty years ago:

> What we are dealing with ... is outrageous conduct, of a kind especially calculated to cause severe mental and emotional disturbance.

Prosser, *supra*, 874 Mich.L.Rev. at 879.

■ The jury heard the proof presented and was properly instructed. The jury made a factual finding that Kroger's conduct was "intentional," "outrageous," "intolerable," and "against the generally accepted standards of decency and morality." In reaching its factual conclusions, the jury acted squarely within its province. Absent some legally compelling reason, we will not ignore the jury's finding and substitute our judgment in its place.

■ Willgruber presented strong proof directed at each of the four elements of the tort of intentional infliction of mental distress. The jury was properly instructed, deliberated, and found in Willgruber's favor and awarded the sum of $70,000.00 for the intentional infliction of mental distress. We hold that the evidence presented in this case satisfied the threshold requirements of the tort of outrageous conduct and the trial court correctly submitted the issue to the jury.

Kroger's complaint with a punitive damage instruction being submitted to the jury is premised on the belief it was entitled to a directed verdict on the underlying claim of intentional infliction of mental distress. Because we find that this claim was properly submitted to the jury for its determination, this claim of error must fail. The trial court correctly submitted the instruction on punitive damages to the jury.

### III. ADMISSION OF SURVEILLANCE EVIDENCE

Kroger complains of the admission of evidence concerning the surveillance of Willgruber. Kroger argues that because its employees did not perform the surveillance, the evidence was irrelevant. We disagree.

■ Although Kroger did not physically conduct the surveillance, it persuaded the disability carrier to do so even after the carrier had determined Willgruber was entitled to disability benefits. Furthermore, Kroger provided the carrier with Willgruber's description and photograph. Evidence of this surveillance and Kroger's role in arranging it was relevant to show that it was a part of Kroger's plan to deny or delay Willgruber his disability benefits in an attempt to economically compel him to sign the documents releasing Kroger from liability.

■ The trial court did not abuse its discretion in allowing the introduction of this testimony. An evidentiary fact is relevant when it has a tendency to make a fact of consequence to the determination of an action more or less probable. KRE 401. Clearly this evidence did so. It is within the discretion of the trial court to determine whether the probative value of proffered evidence is substantially outweighed by undue prejudice. *Ford Motor Co. v. Fulkerson*, Ky., 812 S.W.2d 119 (1991).

Lastly, Kroger maintains that the trial court committed prejudicial error by denying its request for an instruction specifically informing the jury that punitive damages could not be assessed against Kroger for the actions of the disability carrier in conducting surveillance on Willgruber. The trial court correctly overruled this request.

KRS 411.184(3) provides:

In no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question.

At the trial of this action, the disability insurance carrier's actions were never in question. The evidence of surveillance was directed at Kroger's behavior and motives and not those of the disability insurance carrier. The proof left no doubt that the actions of Kroger's employees were authorized and ratified within the meaning of KRS 411.184(3). The trial court's instructions clearly and unequivocally stated that punitive damages could be rendered against Kroger only upon a finding that it had intentionally inflicted mental distress upon Willgruber and that Kroger acted towards Willgruber with fraud, oppression or malice. The instructions on punitive damages were proper and in full accord with KRS 411.184 and KRS 411.186. They contained in detail the definitions and standards to be utilized by the jury in its determination of whether punitive damages were appropriate and, if so, in what amount.

For the reasons set forth in this opinion, the decision of the Court of Appeals is affirmed.

STEPHENS, C.J., LAMBERT, STUMBO and WINTERSHEIMER, JJ., and MILLER, S.J., concur.

GRAVES, J., concurs in part and dissents in part. He does not believe punitive damages were warranted.