**Lisa BURGESS and Jeff Burgess, Appellants,**

v.

**Judy TAYLOR, Appellee.**

**No. 1999–CA–002262–MR.**

Court of Appeals of Kentucky.

March 9, 2001.

Jan G. Ahrens, Louisville, KY, Brief and Oral Argument for Appellants.

Katie Marie Brophy, Louisville, KY, Brief and Oral Argument for Appellee.

Before GUDGEL, Chief Judge,
BARBER, and SCHRODER, Judges.

## OPINION AND ORDER

SCHRODER, Judge.

This appeal questions whether the tort of intentional infliction of emotional distress can apply to the conversion and slaughter of pet horses. We opine that the conduct of the offender rather than the subject of the conduct determines whether the conduct was outrageous. Hence, we affirm.

Judy Taylor ("Taylor") was the owner of two registered Appaloosa horses, nicknamed Poco and P.J. Taylor had owned Poco for 14 years (since he was a foal) and P.J. for 13 years (since her birth). Taylor loved Poco and P.J. as if they were her "children." Taylor and others testified that the horses were gentle and affectionate, and, having spent their entire lives together, were inseparable. After Taylor and her husband separated in 1994, Taylor remained at the marital residence where the horses lived, and she assumed sole responsibility for their care.

Due to a variety of medical problems, including myasthenia gravis, it was difficult for Taylor to perform some of the physical tasks necessary to properly care for her horses by herself. Taylor did not want to sell or separate Poco and P.J.

Therefore, she decided to try to find someone with a farm who would like to care for both of them in exchange for the enjoyment of having them-a common arrangement in the horse world sometimes referred to as a "free-lease agreement." Taylor's brother suggested that his friends, Lisa and Jeff Burgess, who had a small farm with horses of their own, might be interested in such an arrangement. Taylor subsequently spoke to the Burgesses, explained her situation and the arrangement she was looking for. Taylor testified that she explained to Lisa that she never wanted to lose contact with or control of Poco and P.J., that she wanted to be able to visit them, and if the Burgesses ever didn't want to keep them anymore, Taylor would take them back or find another place for them to live. Lisa agreed, assuring Taylor that she loved and was knowledgeable about horses, that she had a nice pasture for them to live in together, that she liked helping people, and that Taylor could come and visit the horses any time she wanted. Believing that she had found a good place for her horses, Taylor agreed to let Poco and P.J. go live with the Burgesses. Taylor did not transfer ownership of the horses, nor ever indicate to the Burgesses that she no longer wanted them. On August 31, 1994, the Burgesses came to Taylor's residence to pick up Poco and P.J. Later that evening, Lisa called Taylor to tell her that they had led them around their new pasture and that the horses were doing fine.

Within the next few days, Lisa Burgess called Eugene Jackson, a known slaughter-buyer, to say she had two horses for sale. On September 6, 1994, Jackson purchased Poco and P.J. from the Burgesses for a total of $1,000.00.

Taylor waited a week before planning her first visit in order to give Poco and P.J. time to adjust to their new surround-

ings. She bought some film and treats for the horses and called Lisa to say that she would like to come and see Poco and P.J. and take some pictures. Lisa told Taylor "they're gone," that she had given them to a man she had met on a trail ride, but she did not know his name. Upset and frightened, Taylor said she needed to know who he was and where her horses were so she would know they were okay and could bring them back to her home. Lisa said she would find out and let Taylor know. The Burgesses then asked their friend, Kenny Randolph, to cover for them by lying and telling Taylor that he had the horses. Randolph never had possession of Poco and P.J. at any time and admitted his role in the events when questioned by a Harrison County, Indiana police detective.

Not hearing from Lisa, and after learning about the dangers of the slaughter market at a humane event over the weekend, Taylor called back and begged Lisa to tell her where Poco and P.J. were. At first, Lisa refused to tell her. Eventually, she lied and said that they were with a Kenny Randolph in the Corydon area of Indiana. Taylor called Randolph and told him she wanted to see her horses. Randolph, lying, told Taylor that he had them, but was not going to let her see them or tell her where they were. Taylor pleaded with him to tell her, and he eventually gave her vague directions to a fictitious location in the Frenchtown, Indiana area where he said they were in a pasture. He refused to give her specific directions or the name of the "gravel road" the pasture was supposedly on. Frantic, Taylor drove to the area and tried to find the gravel road Randolph spoke of. Taylor tried every road she found, stopping and asking people along the way if they had seen the horses, but was, of course, unsuccessful. Finally, it became dark, and a distraught Taylor had to return home.

With the aid of Victoria Coomber, a humane investigator, and Sharon Mayes, president of a local humane organization, in early October 1994, Taylor learned that Poco and P.J. had been purchased from the Burgesses by Eugene Jackson, a known slaughter-buyer, and then sold to Jason Ryan of the Ryan Horse Company, a business which supplies horses to slaughterhouses. Ryan Horse Company sold them to the Beltex Corporation in Texas where they were slaughtered in late September.

On August 23, 1995, Taylor filed an action in Jefferson Circuit Court, naming as defendants, Lisa and Jeff Burgess, Kenny Randolph, and Eugene Jackson. Taylor filed an amended complaint including Jason Ryan, James Ryan, and Ryan Horse Company (hereinafter, the Ryans) as defendants. Randolph was dismissed for lack of jurisdiction. Jackson and the Ryans were dismissed on grounds of improper venue. A jury trial was held on April 13–19, 1999. The jury returned a verdict against the Burgesses, finding that they had breached their agreement with Taylor and that they had intentionally inflicted emotional distress on Judy Taylor.

The jury awarded Taylor $1,000.00, representing the fair market value of the horses for the breach of the free-lease agreement; $50,000.00 in compensatory damages for outrageous conduct; and $75,000.00 in punitive damages, for a total of $126,000.00. The Burgesses filed a motion to alter, amend, or vacate/motion for judgment notwithstanding the verdict/motion for new trial which was denied by the trial court on September 1, 1999. This appeal by the Burgesses followed.

■ The Burgesses first argue that the trial court erred in denying their motion for a directed verdict, contending that the evidence does not support a recovery under the tort of outrage. In ruling on a

motion for a directed verdict, the trial court must accept the evidence of the party opposing the motion as true and draw all inferences from the evidence in that party's favor. A verdict should not be directed unless the evidence is insufficient to sustain the verdict. *Kroger Co. v. Willgruber*, Ky., 920 S.W.2d 61, 64 (1996), *citing Spivey v. Sheeler*, Ky., 514 S.W.2d 667, 673 (1974).

■ The Kentucky Supreme Court recognized the tort of outrage or the intentional infliction of emotional distress in *Craft v. Rice*, Ky., 671 S.W.2d 247 (1984), adopting Section 46 of the *Restatement (Second) of Torts* (1965), which provides:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*See also, Willgruber*, 920 S.W.2d at 65. In order to recover under the tort of outrage, a plaintiff must prove:

> 1) the wrongdoer's conduct must be intentional or reckless;
>
> 2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;
>
> 3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and
>
> 4) the emotional distress must be severe.

*Humana of Kentucky, Inc. v. Seitz*, Ky., 796 S.W.2d 1, 2–3 (1990); *See also, Brewer v. Hillard*, Ky.App., 15 S.W.3d 1 (1999); *Osborne v. Payne*, Ky., 31 S.W.3d 911 (2000). We opine that Taylor presented sufficient evidence of each of these required elements and the trial court properly submitted the claim to the jury.

■ First, it is clear that the Burgesses' conduct was reckless in that they intended their specific conduct and either knew or should have known that emotional distress would result. *Brewer*, 15 S.W.3d at 6. Lisa Burgess admitted that she never had any intentions of keeping Poco and P.J. She sold P.J. and Poco to Eugene Jackson, a known-slaughter buyer, shortly after she acquired them. Further, the jury heard testimony from Kenny Randolph that the Burgesses told him that they had sold the horses to Eugene Jackson to go to slaughter, and that the Burgesses had asked him to lie for them so Taylor would not find out what they had done. There was significant evidence that the Burgesses were aware of Taylor's feelings for Poco and P.J., and hence, knew or should have known that emotional distress would result from their selling them to a slaughter-buyer.

■ Second, the Burgesses' conduct clearly rises to the level of being outrageous and intolerable in that it offends generally accepted standards of decency and morality, certainly a situation "in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'." *Restatement (Second) of Torts*, § 46, cmt. d (1965); *Brewer*, 15 S.W.3d at 6–7. Comment f of § 46 states:

> The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.

*See, Willgruber*, 920 S.W.2d at 67. Compelling evidence was presented at trial establishing Taylor's love for her horses and concern that they were in a good place. Recognizing that love, Lisa Burgess called Judy Taylor the evening she picked up the horses to tell her that she led them around their new pasture and the horses were doing fine. The jury heard evidence of subsequent phone calls by a distraught and frightened Taylor to Lisa Burgess and Kenny Randolph, *begging* to know where her horses were. *Restatement (Second) of Torts,* § 46, cmt. f (1965). The Burgesses knew that Poco and P.J. were heading to slaughter, and that Taylor was, in reality, pleading for their lives. Yet, in the face of Taylor's pleas for the horses she loved like children, the Burgesses continued to lie and refuse to tell her where they were. This Court cannot characterize this emotional torment inflicted by the Burgesses upon Taylor as anything other than "heartless, flagrant, and outrageous." *Id.*

■ Third, the sale of Poco and P.J. by the Burgesses to a known slaughter-buyer satisfies the requirement of a causal connection between the Burgesses' conduct and the emotional distress. Further, the Burgesses' subsequent lies precluded Taylor from locating and saving her horses before they were slaughtered. Additionally, contrary to the Burgesses' assertions, we conclude sufficient evidence was presented from which the jury could properly infer that Poco and P.J. were, in fact, slaughtered.

■ Finally, the evidence indicates that Taylor suffered severe emotional distress. Taylor testified that when she learned what had happened to Poco and P.J., she broke down, knowing that "my babies were dead." Since then she has suffered from many panic attacks, and has had major problems with high blood pressure for which she must receive medical care.

She suffers from anxiety and depression, for which she takes medication, and has had many thoughts of suicide. She described overwhelming feelings of loss and failure. She testified she has trouble sleeping and has recurring nightmares in which she hears Poco's scream in her head. Taylor testified that she has sought help from her doctor and social workers but cannot get over what happened.

■ Having reviewed the record, we opine that Taylor offered sufficient evidence to establish the elements of the tort of outrage, and the trial court properly submitted the claim to the jury. *Willgruber*, 920 S.W.2d at 67. On appeal, we give deference to the jury's determination of conflicting facts and the reasonable inferences drawn from the facts. *Id.* at 64. Having reviewed the evidence in the light most favorable to Taylor, we believe that the jury verdict was supported by sufficient evidence.

■ Next, the Burgesses contend that, under Kentucky law, "the proper award of damages for the loss or damage to an animal is the value of that animal, not emotional damages for that loss". We disagree. *Faulkner Drilling Co., Inc. v. Gross,* Ky.App., 943 S.W.2d 634 (1997) established that an action for tort may be combined with a breach of contract and that punitive damages may also be asserted. *Cincinnati, N.O. & T.P. Ry. Co. v. Rankin,* 153 Ky. 730, 156 S.W. 400 (1913), cited by the Burgesses to support their argument for fair market value, did not involve a claim for emotional damages and did not hold that there cannot be a claim for intentional infliction of emotional distress. *Cincinnati, N.O. & T.P. Ry. Co.* involved the liability of a common carrier transporting livestock under a tariff contract and is not relevant to this case. There was no allegation that pets were involved and the case was before *Craft.*

There are no cases in Kentucky holding that a finding of intentional infliction of emotional distress or punitive damages is precluded simply because the facts giving rise to the claim involve an animal. Indeed, we conclude that the second element in application of the tort of the intentional infliction of emotional distress depends on the facts of the case as to the offender's conduct and not to the subject of said conduct.

 The Burgesses next argument is that the jury's award of $50,000.00 of compensatory and $75,000.00 of punitive damages for emotional distress was excessive, contending that under the "first blush" rule, it had to have been given under the influence of passion or prejudice. *Cooper v. Fultz*, Ky., 812 S.W.2d 497 (1991). The "first blush" rule, however, is not the proper appellate standard for review of an award of damages. *Brewer*, 15 S.W.3d at 9. Rather, when confronted with the issue of reviewing an award of damages for excessiveness or inadequacy, the trial court and appellate court perform different functions. *Cooper*, 812 S.W.2d at 501; *Davis v. Graviss*, Ky., 672 S.W.2d 928 (1984). As stated in *Davis* at 932:

> [T]he trial court and appellate court have different functions ... the trial court is charged with the responsibility of deciding whether the jury's award appears "to have been given under the influence of passion or prejudice or in disregard of the evidence or the instructions of the court." CR 59.01(d). This is a discretionary function assigned to the trial judge who has heard the witnesses first-hand and viewed their demeanor and who has observed the jury throughout the trial.

*Cooper*, 812 S.W.2d at 501. The proper appellate function is articulated in *Prater v. Arnett*, Ky.App., 648 S.W.2d 82, 86 (1983):

> [T]he appellate court no longer steps into the shoes of the trial court to inspect the actions of the jury from his perspective. Now, the appellate court reviews only the actions of the trial judge ... to determine if his actions constituted an error of law. There is no error of law unless the trial judge is said to have abused his discretion and thereby rendered his decision clearly erroneous.

*Cooper*, 812 S.W.2d at 501. "Once the issue [excessive or inadequate damages] is squarely presented to the trial judge, who heard and considered the evidence, neither we, nor will the Court of Appeals, substitute our judgment on excessiveness [or inadequacy] for his unless clearly erroneous." *Id.*, quoting *Davis*, 672 S.W.2d at 933.

 Whether an award is excessive, appearing to have been given under the influence of passion or prejudice, is a question dependent on the nature of the underlying evidence. *Cooper*, 812 S.W.2d at 501. The trial court considered this issue, presented in the Burgesses' motion to alter, amend, or vacate/motion for judgment notwithstanding the verdict/motion for new trial, and found that when viewed in relation to all of the evidence submitted to the jury, the jury's award was not excessive and based only on sympathy, passion, and prejudice. Having reviewed the record and testimony, we conclude the trial court did not abuse its discretion in so finding.

 The Burgesses next argue that the award of punitive damages should be set aside, as the jury instructions failed to articulate the "clear and convincing" standard required by KRS 411.184(2) and the guidance factors contained in KRS 411.186. These errors were not properly preserved for our review and will not be considered by this Court on appeal. CR 51(3); *Mas-*

sie v. Persson, Ky.App., 729 S.W.2d 448 (1987), *overruled on other grounds by*, *Conner v. George W. Whitesides Co.*, Ky., 834 S.W.2d 652 (1992). The Burgesses' citations to the record reveal an objection on the grounds that "nobody knows what the law is" and a "general objection to the instructions as tendered." Such a general objection without specification is insufficient to preserve the error. *Commonwealth v. Conatser*, Ky., 329 S.W.2d 48 (1959).

"A complaint as to instructions will not be considered when the trial court's attention was not called to the point." *Pipelines, Inc. v. Muhlenberg County Water District*, Ky., 465 S.W.2d 927, 932 (1971). The Burgesses first asserted these specific errors in their motion for a new trial. An objection to a jury instruction raised for the first time in a motion for a new trial is not timely and will not be considered by this Court. *Harris v. Thompson*, Ky., 497 S.W.2d 422 (1973); *Buchanan v. Brown*, Ky., 458 S.W.2d 765 (1970); *Bingham v. Davis*, Ky., 444 S.W.2d 123 (1969).

The Burgesses next contend that Kentucky's "unclear and poorly defined punitive damages law" violated their right to due process. This issue was not raised in or decided by the trial court and as such is precluded from our review. *Regional Jail Authority v. Tackett*, Ky., 770 S.W.2d 225, 228 (1989).

The Burgesses next argue that the award of punitive damages for intentional infliction of emotional distress results in double recovery for Taylor. We disagree. The $50,000.00 award for compensatory damages for the tort of outrageous conduct is calculated to make whole, or compensate, Judy Taylor for her actual or consequential loss. *See Smith v. McMillan*, Ky., 841 S.W.2d 172 (1992); *Paducah Area Public Library v. Terry*, Ky.App., 655 S.W.2d 19 (1983). This includes damages for emotional distress for intentional acts regardless of whether accompanied by physical injury. *See Capital Holding Corp. v. Bailey*, Ky., 873 S.W.2d 187 (1994); *Craft v. Rice*, Ky., 671 S.W.2d 247 (1984). Punitive or exemplary damages, on the other hand, are not intended to compensate a victim for his or her loss, but are designed to punish or deter a person, and others, from committing such acts in the future. KRS 411.184(1)(f); *Owens–Corning Fiberglas Corp. v. Golightly*, Ky., 976 S.W.2d 409 (1998); *Horton v. Union Light, Heat & Power Co.*, Ky., 690 S.W.2d 382 (1985). Therefore, a victim of outrageous conduct can recover both compensatory and punitive damages. *Willgruber*, 920 S.W.2d at 67–68.

The Burgesses next argue that the trial court erred in refusing to grant their motion for a mistrial. The Burgesses contend that no evidence was presented that the horses were actually slaughtered, and that the testimony of Taylor's expert witness, Victoria Coomber, regarding the slaughter business was prejudicial. A mistrial should only be granted by the trial court if there is a manifest, urgent, or real necessity for such action. *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672 (1985), *cert. denied*, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986). The Kentucky Supreme Court has stated:

> It is universally agreed that a mistrial is an extreme remedy and should be resorted to only when there is a fundamental defect in the proceedings which will result in a manifest injustice. The occurrence complained of must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way.

*Gould v. Charlton Co., Inc.,* Ky., 929 S.W.2d 734, 738 (1996). With regard to the standard in civil cases, the Court went on to state, " 'Mistrials in civil cases are generally regarded as the most drastic remedy and should be reserved for the most grievous error where prejudice cannot otherwise be removed.' [Citation omitted.]" *Id., quoting Reed v. Wimmer,* 195 W.Va. 199, 465 S.E.2d 199, 207 (1995).

▬▬▬ Our review of the record, including a review of the entire testimony of Victoria Coomber, indicates no such error nor prejudice. The trial court did not permit Coomber to testify as to inhumane practices in the slaughterhouses, that P.J. and Poco were slaughtered, nor imply that they were slaughtered in an inhumane manner inconsistent with federal regulations. Further, the Burgesses' contention that there was no evidence presented that the horses were slaughtered is without merit. The testimony of Kenny Randolph, Lisa Burgess, Eugene Jackson, and the Ryans provided sufficient evidence to support a finding by the jury that Taylor's horses were sold for slaughter, and slaughtered. Absent an abuse of discretion, a trial court's decision whether or not to grant a mistrial will not be disturbed. *Gould,* 929 S.W.2d at 741. We adjudge no such abuse of discretion and the ruling of the trial court will not be disturbed.

▬▬▬ Finally, the Burgesses contend that reversible error resulted from the use of hearsay statements at trial. Having reviewed those portions of the record cited by the Burgesses, including the entire transcript of Victoria Coomber's testimony, and the video testimony of Sharon Mayes, we conclude the trial court was correct in its rulings. Coomber did testify extensively during trial about out-of-court statements made to her by the defendants. Coomber was an out-of-state expert witness who flew in to testify and had a return flight to catch. The trial court noted that Coomber had to catch a plane *the next morning,* and that the court would do whatever necessary to get Coomber's testimony in that day. A trial court has the discretion to allow a witness to be called out of turn to accommodate a witness's schedule or to expedite the trial. CR 43.02(c); *Jones v. Commonwealth,* Ky., 463 S.W.2d 936 (1970); and *Fayette County v. Veach,* Ky., 294 S.W.2d 541 (1956). When counsel objected to Coomber's testimony as to statements made to her by parties, the trial court overruled the objections on the grounds that the parties were present and were to be called as witnesses. This would apply to Sharon Mayes also. KRE 801A allows prior statements of witnesses and admissions if the declarant is available as a witness, and is examined concerning the statement, after the proper foundation is laid, and the statement is inconsistent with the declarant's testimony at trial (impeachment). The plaintiff's problem with the "forgetful" witness is not new to Kentucky courts. In *Wise v. Commonwealth,* Ky.App., 600 S.W.2d 470 (1978), two women gave statements concerning an event they witnessed but by the time of trial, they both claimed a loss of memory. The prior statements were properly admitted, with this Court stating that the rule under *Jett v. Commonwealth,* Ky., 436 S.W.2d 788 (1969), which allows impeachment of witnesses, applies to both criminal and civil cases, that "[n]o person should have the power to obstruct the truth-finding process of a trial and defeat a prosecution by saying, 'I don't remember.' The trial judge has a broad discretion in deciding whether or not to permit the introduction of such contradictory evidence, ..." *Wise,* 600 S.W.2d at 472. *See also Thurman v. Commonwealth,* Ky., 975 S.W.2d 888 (1998); *Brock v. Commonwealth,* Ky., 947 S.W.2d 24 (1997).

The appellee's motion to strike appellants' brief and dismiss this appeal is DENIED. The renewed motion to dismiss and motion to disregard the supplemental record on appeal have been denied previously by a three-judge panel.

For the foregoing reasons, the judgment of the Jefferson Circuit Court is affirmed.

ALL CONCUR.