**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0659n.06
Filed: August 4, 2005

No. 04-5921

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DEBORAH FERRER, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| MEDASTAT USA, LLC; KEVIN A. | ) | |
| MCKIM; PAUL ELMES, | ) | |
| | ) | **O P I N I O N** |
| **Defendants-Appellees.** | ) | |
| | ) | |

**Before: MOORE and COLE, Circuit Judges, and WISEMAN,[*] District Judge.**

**KAREN NELSON MOORE, Circuit Judge.** This is a diversity case alleging retaliatory discharge in violation of the Kentucky Civil Rights Act ("KCRA") and intentional infliction of emotional distress ("IIED") in violation of the Kentucky common law.[1] Plaintiff Deborah Ferrer ("Ferrer") asserts that her former employer, MedaSTAT USA, LLC ("MedaSTAT"), and her former supervisors, Kevin A. McKim ("McKim") and Paul Elmes ("Elmes"), retaliated against her in violation of the KCRA and Kentucky tort law for reporting sexual harassment by another

---

[*]The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

[1]Plaintiff Deborah Ferrer ("Ferrer") is a resident of Wyoming, Michigan. Defendant MedaSTAT USA, LLC ("MedaSTAT") is a Kentucky limited liability company with its principal place of business in Kentucky. Defendant Kevin A. McKim ("McKim") is MedaSTAT's president and is a resident of Kentucky. Defendant Paul Elmes ("Elmes") is also a resident of Kentucky.

MedaSTAT Employee, Brian Woolsey ("Woolsey"), while both Ferrer and Woolsey were in Florida. Only two issues are presented in this appeal: (1) whether the district court erred in concluding that Ferrer's KCRA claims were barred as extraterritorial under *Union Underwear Co. v. Barnhart*, 50 S.W.3d 188 (Ky. 2001); and (2) whether the conduct of McKim, Elmes, and MedaSTAT was so extreme and outrageous to qualify as IIED under Kentucky law. We **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Taken in the light most favorable to Ferrer, the party opposing the summary judgment motion, the facts of this case can be summarized as follows. MedaSTAT hired Ferrer on February 26, 2001, as Regional Sales Manager for Florida, Southern Alabama, and Mississippi. Her immediate supervisors in this position were McKim and Elmes. She underwent spinal surgery on April 24, 2001. A doctor's note dated May 10, 2001, stated the following:

> The above named patient [Ferrer] is able to return to work with modifications: No lifting greater than 20 lbs., no prolonged sitting or standing (more than 30 mins. at a time) and no overhead activities. No bending or stooping.

Joint Appendix ("J.A.") at 55 (note from Michael W. Reed, M.D.).

In May 2001, MedaSTAT employee Brian Woolsey traveled to Florida to provide training to Ferrer in regard to "the oxygen business." J.A. at 82 (Ferrer Answers to Interrogatories). Woolsey and Ferrer met on May 15, 2001, visited several customers, ate lunch, and went over information relating to the oxygen business. At Woolsey's insistence, they went to dinner at a beachfront restaurant. They ordered drinks, and Woolsey began propositioning Ferrer,[2] offering her

---

[2]Woolsey's propositions went beyond proposals for two-person sexual activities, and included propositions for participation in sexual activities involving himself, Ferrer, and at least one other individual.

drugs, suggesting that "anyone would want to sleep with me [Ferrer], especially Paul [Elmes]," J.A. at 82 (Ferrer Answers to Interrogatories), and hinted that Ferrer could advance her career with MedaSTAT through sexual activity with Woolsey or others. Ferrer declined Woolsey's advances, asked for the bill, and left without ordering dinner. Ferrer then returned home, declined a further advance from Woolsey by telephone, and discussed the evening's events by telephone with her parents and with a friend.

Deciding that she should not wait until morning to report Woolsey's actions, Ferrer called McKim and Elmes at approximately 10:00 or 10:30 p.m. that evening. McKim initially told Ferrer he would investigate her allegations, but Elmes became angry and blamed the incident on Ferrer. McKim then "told me [Ferrer] to work out what happened and send it to him in the morning." J.A. at 83 (Ferrer Answers to Interrogatories). The next morning, however, McKim called Ferrer around 8:00 a.m. Although Ferrer had not finished writing her statement, McKim told her to finish it within half an hour and fax it directly to him.[3]

On May 17, 2001, Ferrer was suspended without pay from her employment with MedaSTAT, purportedly because her doctor's release did not allow her to perform her required job

---

[3]Although this chronology suggests that Ferrer sent her statement to McKim on May 16, 2001, the statement included in the Joint Appendix is dated May 17, 2001. *See* Joint Appendix ("J.A.") at 107-08 (May 17, 2001 memorandum from Ferrer to McKim).

responsibilities.[4]  Someone picked up her company car and company files on May 21, 2001.  On

May 24, 2001, Ferrer was terminated, with no express reason stated for the termination.[5]

---

[4]The body of the suspension letter, from McKim, read in full:

Please accept this as formal notification that you are, effective immediately, suspended wihout pay from your duties as Regional Sales Manager in an effort to limit liability exposure for the company and assist you in remaining healthy and free from harms way.  SAFETY FIRST.

The Doctor's release that is dated May 10, 2001 is not acceptable for you to be able to perform your duties as described in you[r] job description.  Please do not call or visit any customers and limit the amount of personal driving in the MedaSTAT vehicle to less than 30 minutes at a time.  If a customer or employee contacts you directly, please defer them to the corporate office or myself.

As evidenced by the week of April 30th, 2001, you were unable to drive, due to Doctor's orders, as well as being unable to effectively manage and track the staff in your territory from your home office.  Once you are able to secure and produce a Doctor[']s release that allows you to perform the duties as described in you[r] job description (see attached), your status will be reviewed.

J.A. at 110 (May 17, 2001 letter from McKim to Ferrer).

[5]The body of the termination letter, from McKim, stated in full:

Please be advised that MedaSTAT USA has decided to terminate your position as Regional Sales Manager effective immediately as of May 24, 2001.  Any issues that may concern your termination of employment will be resolved consistent with the stated policies contained in the employee handbook.  Should you have any questions or concerns, you are urged to address them in written correspondence with the company.

All monies owed to you (i.e. salary, expenses) have been paid, or will be paid after it has been shown that MedaSTAT has received all equipment that was or is in your possession.  MedaSTAT expects that you will voluntarily respect your obligations provided in the your [sic] Employment Agreement, specifically including, but not limited to, the territorial and time restraints of the non-compete covenant as well as the confidentiality clause that your agreed to when you executed your employment agreement with us.

Again, if you have any questions with respect to the agreement, we urge you to correspond with the company before taking any action that may violate the agreement or injure MedaSTAT.  Within the guidelines of your agreement, we wish you the best in your future endeavors.

J.A. at 111 (May 24, 2001 letter from McKim to Ferrer).

4

## II. ANALYSIS

### A. Jurisdiction and Standard of Review

As Ferrer seeks to recover a sum exceeding $75,000 exclusive of interest and costs from citizens of a different state, the district court had jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

We conduct de novo review of decisions granting summary judgment, drawing all reasonable inferences in favor of the nonmoving party. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). To defeat summary judgment, the nonmovant must simply show "sufficient evidence to create a genuine issue of material fact." *Johnson*, 398 F.3d at 873 (internal quotation omitted).

### B. KCRA Claim

Ferrer's KCRA claim arises under § 344.280 of the Act, which makes it unlawful for one or more persons to retaliate against another person because she "has opposed a practice [such as sexual harassment] declared unlawful by" chapter 344 of the Kentucky Revised Statutes, the chapter governing civil rights. KY. REV. STAT. ANN. § 344.280.[6] The district court held that the Kentucky

---

[6]The relevant provision states:
It shall be an unlawful practice for a person, or for two (2) or more persons to conspire:
> (1) To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter . . . .

KY. REV. STAT. ANN. § 344.280. Chapter 344 prohibits, among other things, sexual harassment. KY. REV. STAT. ANN. § 344.040; *see also Bank One, Kentucky, N.A. v. Murphy,* 52 S.W.3d 540, 544

Supreme Court's holding in *Barnhart* prohibited Ferrer's claim as an improper extraterritorial application of the KCRA.

Both parties agree that the outcome is governed by the determination whether, under *Barnhart*, application of the KCRA to retaliation by MedaSTAT, McKim, and Elmes against Ferrer is considered an extraterritorial application of the KCRA. The broad statements in the *Barnhart* majority opinion suggest that the Kentucky Supreme Court intended for *Barnhart* to be read broadly:

> The extraterritorial application of one state's legislation to prevent age-based discrimination [prohibited by the same statutory provision, KY. REV. STAT. ANN. § 344.040, that prohibits sexual harassment] upon the employment practices of another state could result in competing jurisdictions and difficult choice of law questions, all of which would delay rather than expedite the disposition of age-based discrimination cases. Such a result would be contrary to one of the [Federal Age Discrimination in Employment Act's] primary purposes, which is the expeditious disposition of cases. Expediency is particularly important in these type[s] of cases because those aggrieved by acts of age-based discrimination by definition have relatively fewer productive years left.
>
> We conclude by noting that the decision by a state to provide additional protection against age-based discrimination in employment is a policy decision of that state. Imposing the policy choice by the Commonwealth on the employment practices of our sister states should be done with great prudence and caution out of respect for the sovereignty of other states, and to avoid running afoul of the Commerce Clause of the United States Constitution.

---

(Ky. 2001).

*Barnhart*, 50 S.W.3d at 193 (citation omitted).[7]  This analysis suggests that the Kentucky Supreme Court has made a policy decision, based on a combination of interstate comity and a desire to avoid choice-of-law difficulties, not to apply the KCRA to employment situations that might arguably create a conflict with the laws of other states.  In particular, this suggests that the KCRA is inapplicable to *injuries* that occur outside of Kentucky's borders, regardless of whether the action causing the relevant injury takes place within Kentucky.  *See Barnhart*, 50 S.W.3d at 192 n.1 (noting that "there is liberal policy for protecting workers who suffer injury *within* the territorial boundaries of the Commonwealth").  Absent any Kentucky authority limiting the application of *Barnhart*'s extraterritoriality holding, we are bound to that holding.  Accordingly, we conclude that, under the Kentucky Supreme Court's interpretation, the KCRA does not provide Ferrer with a remedy for any retaliation she suffered in Florida.

## C.  IIED Claim

As an alternative to her KCRA claim, Ferrer also asserts that the actions taken by McKim, Elmes, and MedaSTAT in retaliation for her decision to report Woolsey's harassment constitute IIED under Kentucky law.  On the facts of this case, we are unable to agree.

---

[7]Facts noted by the dissent in *Barnhart* provide additional support for this conclusion, as they suggest that Barnhart was in some type of managerial position that required regular contact with the Kentucky office.  Specifically, the dissent noted:
> While Fruit of the Loom is incorporated in New York, its principal place of business is in Bowling Green.  Barnhart reported directly to the company headquarters in Bowling Green and the decision to demote Barnhart because of his age was made and approved at corporate headquarters in Bowling Green.  In sum, every decision that gives rise to Barnhart's claim occurred at corporate headquarters in Bowling Green.

*Union Underwear Co. v. Barnhart*, 50 S.W.3d 188, 193 n.1 (Ky. 2001) (Lambert, C.J., dissenting).

7

Kentucky provides recovery for IIED as set forth in the *Restatement (Second) of Torts* § 46. *Craft v. Rice*, 671 S.W.2d 247, 251 (Ky. 1984). To establish IIED, a plaintiff must prove four elements:

1. The wrongdoer's conduct must be intentional or reckless;
2. The conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;
3. There must be a causal connection between the wrongdoer's conduct and the emotional distress; and
4. The emotional distress must be severe.

*Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996). Ferrer has clearly satisfied the first element, as the defendants do not assert that their conduct was unintentional. She has also satisfied the third element, as the defendants do not assert that there is no causal connection between their conduct and her distress. However, the second and fourth elements are more complicated.

In regard to the second element, often the key issue in an IIED claim, the Kentucky Supreme Court has explained: "Citizens in our society are expected to withstand petty insults, unkind words and minor indignities. Such irritations are a part of normal, every day life and constitute no legal cause of action. It is only outrageous and intolerable conduct which is covered by this tort." *Willgruber*, 920 S.W.2d at 65. We begin our analysis by noting that retaliatory dismissal from employment for reporting sexual harassment is well beyond the petty insult or minor indignity. In fact, in certain cases it might be done in a sufficiently outrageous manner as to support an IIED claim in addition to standard employment-law remedies. *Cf. Brewer v. Hillard*, 15 S.W.3d 1, 8 (Ky. Ct. App. 1999) (noting that assault or battery with the intention to cause extreme emotional distress can give rise to an IIED claim in addition to the assault or battery claim). Nonetheless, we do not believe that an IIED claim under Kentucky law can be sustained on the facts of this case.

8

Ferrer asserts what is essentially a standard retaliation claim: she reported sexual harassment, and shortly thereafter she was suspended and then fired. We are unaware of any Kentucky decision upholding such a claim as an IIED claim. Those situations in which IIED claims have been allowed involved much more severe fact situations.[8] *See, e.g.*, *Osborne v. Payne*, 31 S.W.3d 911 (Ky. 2000) (sexual relationship between priest serving as a marriage counselor and plaintiff's former wife, during the period that marriage-counseling services were being provided); *Willgruber*, 920 S.W.2d at 66 ("calculated attempt to coerce [plaintiff] to sign release papers exonerating [defendant] for its wrongful discharge of [plaintiff]"); *Craft*, 671 S.W.2d at 248 (surveillance of plaintiff wife at home and at work, threats to plaintiff wife to put plaintiff husband in jail, and driving so as to force plaintiff wife's vehicle into the lane of oncoming traffic); *Wilson v. Lowe's Home Center*, 75 S.W.3d 229, 238 (Ky. Ct. App. 2002) ("racial remarks on nearly a daily basis by [plaintiff's] coworkers and supervisors for a period of approximately seven years"); *Brewer*, 15 S.W.3d at 4, 7-8 (repeated requests by supervisor for homosexual relations, together with unwanted physical touching). Moreover, Kentucky courts have declined to permit IIED claims in fact situations that seem more troubling than that involved in the present case. *See, e.g.*, *Humana*

---

[8]The Kentucky Supreme Court recently reiterated its agreement with the standard described in the *Restatement (Second) of Torts*:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 789 (Ky. 2004) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965).

9

*of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 3-4 (Ky. 1990) (failure of hospital nurses to respond promptly to request for help from patient who had just delivered baby, stillborn, into a bedpan); *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 296, 298-99 (Ky. Ct. App.1993) (no IIED for sexual abuse of grade school student by parish priest, where the "conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed"). The cases Ferrer cites from other jurisdictions do not suggest otherwise. In *Rauh v. Coyne*, 744 F. Supp. 1186 (D.D.C. 1990), the court simply held that retaliatory discharge for reporting sexual harassment was "not insufficient as a matter of law to make out a claim for [IIED]." *Id*. at 1190-91. In *Norcon, Inc. v. Kotowski*, 971 P.2d 158 (Ak.1999), the company's actions after the plaintiff reported the sexual harassment were substantially more extreme:

> [Prior to her termination,] Kotowski was questioned by six people employed by Norcon, Veco, and their security contractor. She described the interrogation as "very hostile." She was apprehensive, nervous, and frightened. She testified that the interrogation lasted about four hours and that at times she cried. Afterwards, Kotowski was told that she could spend the night in the Norcon barracks. But she was concerned for her safety, and decided instead to sleep in a girlfriend's car.

*Id*. at 163. As we conclude that under Kentucky law Ferrer has failed to establish the second element of an IIED claim, it is not necessary for us separately to address the fourth element, whether her distress was severe.

### III. CONCLUSION

We **AFFIRM** the judgment of the district court.

10